# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| PRENTISS PHILLIPS, | ) | |
| | ) | Case No. 3:23-cv-188 |
| *Plaintiff,* | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Jill E. McCook |
| CALEIGH CLINE, | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## MEMORANDUM AND ORDER

---

Plaintiff, a Tennessee Department of Correction ("TDOC") prisoner housed in the

Morgan County Correctional Complex ("MCCX"), filed this pro se lawsuit for violation of 42

U.S.C. § 1983 (Doc. 2). This action proceeded only as to Plaintiff's claims that, between

February 2023 and May 2023: (1) Defendant cancelled his chronic care medications and failed to

examine a lump in his chest in violation of the Eighth Amendment; and (2) the cancellation of

his chronic care medications was retaliation for him filing a sick call request regarding those

medications in violation of the First Amendment (Doc. 2, at 6–7; Doc. 63, at 2).

Now before the Court are (1) Plaintiff's filings seeking additional discovery (Docs. 61,

67, 70, 72); (2) Defendant's motions to file joint appendices for her motion for summary

judgment filings under seal (Docs. 73, 84); (3) Defendant's motion for summary judgment and

supporting memorandum (Docs. 75, 76); (4) Plaintiff's motion for injunctive relief and

supporting declaration (Docs. 88, 89); and (5) Plaintiff's motion for an extension of time to file

his pretrial narrative statement (Doc. 98). For the reasons set forth below, Plaintiff's requests for

additional discovery (Docs. 61, 67, 70, 72) will be **DENIED**; Defendant's motions (1) to file

documents under seal (Docs. 73, 84) and (2) for summary judgment (Doc. 75) will be **GRANTED**; all other pending motions will be **DENIED AS MOOT**; and this action will be **DISMISSED**.

## I.    DISCOVERY

### A.    Procedural History

About two months after Defendant filed her answer to Plaintiff's complaint, Plaintiff filed a request that the Court have Defendant and/or the United States Marshal issue subpoenas for both his medical file from 2019 and 2023 and Defendant's personnel file (Docs. 18, 19).  The Court granted Defendant's motion to quash these subpoenas (Doc. 33, at 1–2).

About five months later, on October 23, 2024, the Court entered an order noting that, based on the parties' prior filings, it appeared that Defendant had provided Plaintiff with printed copies of some of his medical records, but Plaintiff claimed that those printed records were incomplete and otherwise improper (Doc. 63, at 4).  The Court therefore ordered that (1) Defendant again contact the MCCX Warden and/or another MCCX official to attempt to find a way that, within fourteen days of entry of that order, Plaintiff could access his medical records through the compact disc she previously provided and print the portions he seeks to admit as evidence herein, and (2) if that was not possible, Defendant provide Plaintiff with a full printed copy of his medical records within twenty-one days of entry of that memorandum and order (*Id.*).

Less than a week before the Court entered its October 23 order regarding discovery, Plaintiff filed a motion requesting that the Court compel Defendant to produce his medical file "from 2019 January to February 2023," that is now before the Court (Doc. 61, at 1).  In support of this request, Plaintiff states that these records contain "documentation from specialists about

2

his medical conditions and will further show no medical professional would discontinue all medical care without laying a[n] eye on the Patient" (*Id.* at 1–2). Plaintiff specifies that he seeks to receive his medical records from Nashville, as he states that such records "can[']t be forged," and he also asserts that Defendant failed to properly respond to a discovery request asking about her work history prior to MCCX and "when and exactly where" she got her medical license (*Id.* at 2).

Defendant filed a response to this motion indicating in relevant part that (1) she updated her discovery response regarding her work history; (2) the pending motion to compel fails to comply with the Federal Rules of Civil Procedure; and (3) Plaintiff has presented no evidence of forgery in his medical records (Doc. 64). Defendant later notified the Court that she had provided Plaintiff with a hard copy of his medical file in accordance with the Court's October 23 order (Doc. 66, at 2–3).

Plaintiff next filed a notice indicating that he still could not access his medical records through the disc Defendant provided (Doc. 67). Defendant responded by relying on her prior filing stating that she had provided Plaintiff a hard copy of his medical records (Docs. 68, 69).

Plaintiff then filed a notice claiming that Defendant provided him two boxes of "worthless" documents that did not contain what he had requested but included old sick call forms, duplicates of documents, and numerous blank pages (Doc. 70, at 1–2). In this filing, Plaintiff again states that he seeks his "medical file from TDOC in Nashville," which he claims contains "documented entries of my specific injuries and ailments [I']ve seen them prior to my arrival at MCCX at appointments even treatments ordered by other doctors [that] were intentionally left out of what they sent. [T]his way no one can attempt to pull a fast one and mislead the Court" (*Id.* at 2).

Defendant's response states, among other things, that (1) the medical records she provided Plaintiff were accompanied by an affidavit from a TDOC records custodian; (2) she provided Plaintiff with a copy of all the medical records she received pursuant to a subpoena she served on the TDOC, as she is not the custodian of Plaintiff's records; and (3) any missing records are due to the TDOC's error, not hers (Doc. 71, at 3–5).

On December 18, 2024, Plaintiff filed a reply indicating in relevant part that "most of what was sent was either blank sheets of copy paper with serial numbers on them[,] sick call forms of which 'hundreds' were not even responded to[,] and refusal slips saying [I] refused sick call yet not signed by me but medical AND [I] was charged co pay and not seen" (Doc. 72, at 1). Plaintiff also claims that "[D]efendant only sent snippets of my file and ironically MOST of it is from MCCX that is why . . . Plaintiff specifically requested a 'CERTIFIED' copy of his medical file to come from Nashville via TDOC because there's no way to alter nor forge documents nor mislead this Court" [*Id.* at 1–2]. To support these statements, Plaintiff states that he has injuries to his spinal column, labrum, and a tendon, for which he alleges "a medical provider named Miss Agard" had recently failed to adequately provide him medical treatment [*Id.* at 2–3].

## B. Legal Standard

Under Rule 26 of the Federal Rules of Civil Procedure, parties are entitled to discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The factors for district courts to consider regarding discovery disputes under this Rule include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* Also, a motion to compel

4

discovery "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1).

Additionally, "[t]he general rule is that summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery." *Vance By and Through Hammons v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996). The party seeking additional discovery in the face of a motion for summary judgment has the burden of demonstrating the necessity of the requested discovery by "showing by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition without discovery." *King v. Harwood*, 852 F.3d 568, 579 (6th Cir. 2017) (citations omitted). "Mere recitations of conclusory allegations are insufficient." *Id.*

Where a district court denies a request for discovery while a motion for summary judgment is pending, the Sixth Circuit will consider the following factors in determining whether this was an abuse of discretion: (1) when the party seeking discovery learned of the discovery issue, (2) how further discovery would affect the summary judgment ruling, (3) the length of the discovery period, (4) whether the moving party was dilatory, and (5) whether the adverse party was responsive. *Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 478 (6th Cir. 2010). The primary consideration is whether the moving party diligently pursued discovery. *Id.* However, *"*[a] district court does not abuse its discretion [by denying discovery in the face of a summary judgment motion] when, as here, granting a party's request for additional discovery 'would not have changed the ultimate result.'" *Health & Wellness Lifestyle Clubs, LLC v. Raintree Golf, LLC*, 808 F. App'x 338, 346 (6th Cir. 2020) (quoting *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1197 (6th Cir. 1995)).

5

### C.    Analysis

Liberally construing Plaintiff's discovery filings together, he generally asserts that Defendant has provided him with an incomplete copy of his medical records, and the Court should therefore allow him to subpoena a copy of his medical record directly from TDOC.  But Plaintiff has not demonstrated that he is entitled to this discovery under the applicable law.

First, Plaintiff's motion to compel discovery is not accompanied by the "good faith" certification that Fed. R. Civ. P. 37(a)(1) requires.  Plaintiff also did not file any affidavit or declaration specifying his need for more discovery to respond to Defendant's motion for summary judgment, as required for the Court to grant him additional discovery under Fed. R. Civ. P. 56(d).  *King*, 852 F.3d at 579 (citations omitted).  Accordingly, Plaintiff's discovery filings are **DENIED** on these grounds.  *Id.*; *Sweeting v. Schweigtzer*, No. 19-3930, 2020 WL 5822513, at *3 (6th Cir. July 31, 2020) (relying on Rule 37(a)(1) to hold that where the moving party "made no showing that he had properly served his interrogatories on the defendants or attempted to confer with them, the district court did not abuse its discretion by failing to order the defendants to respond").

Additionally, as to the Rule 26(b)(1) factors set forth above, the Court finds that (1) Plaintiff's claims proceeding herein have substantial constitutional importance; (2) Plaintiff seeks a total of $1500 in damages from Defendant (Doc. 2, at 12); (3) the record demonstrates that both parties have access to Plaintiff's medical records only through subpoena of the TDOC medical records custodian; (4) as Plaintiff is proceeding *in forma pauperis* herein and is incarcerated, the Court presumes he has fewer resources than Defendant; (5) Plaintiff has not provided any facts to establish that the medical records that are allegedly missing from the documents Defendant provided him are relevant to the chronic care medications or lump at issue

in his claims proceeding herein; and (6) Defendant's filings indicate that she has provided Plaintiff with all the medical records she received pursuant to the subpoena she sent the TDOC, Defendant has filed extensive medical records documenting in detail Plaintiff's medical requests for medical care and the medical care provided and offered to Plaintiff from the relevant time period in support of her motion for summary judgment, and Plaintiff has not set forth any specific facts to support his general allegation that the medical records he has received are incomplete, nor does he set forth facts indicating that any allegedly missing medical records are relevant to his claims. Accordingly, after balancing these factors, the Court finds that they do not weigh in favor of granting Plaintiff more discovery.

The Court additionally finds that the factors that apply to Plaintiff's request for discovery in the face of a motion for summary judgment do not weigh in his favor. Specifically, as to the first and fourth factors, Plaintiff promptly raised his concerns about the medical records he received from Defendant. As to the third factor, the parties had ample time for discovery, and Plaintiff raised this discovery dispute during the open discovery period (Docs. 61, 63).

As to the second and fifth factors, however, nothing in the record indicates that further discovery would change the Court's ruling on the pending summary judgment motion, and the record demonstrates that Defendant was responsive to Plaintiff's request for his medical records. Specifically, Defendant's filings demonstrate that she provided Plaintiff with all his medical records as they came to her from the TDOC pursuant to a subpoena (Doc. 71, at 3–5; Doc. 71-1). And Plaintiff has not set forth any specific facts or sworn proof to support his general assertion that the medical records Defendant provided him are incomplete, such that he would benefit from issuing his own subpoena to the TDOC. To the contrary, Plaintiff only sets forth unsworn general allegations that more records for unspecified medical issues must exist (Doc. 61, at 1;

Doc. 67, at 2; Doc. 70, at 2), and an assertion that in approximately December 2024, which is more than 18 months after he filed his complaint (Doc. 2), a nurse other than Defendant failed to adequately treat injuries to his spinal column, labrum, and a tendon due to this lawsuit (Doc. 72, at 2–3).

But Plaintiff's active Tennessee sentences were imposed in 1999.

https://foil.app.tn.gov/foil/details.jsp (last visited June 25, 2025). Also, as set forth above, only Plaintiff's claims that, between February 2023 and May 2023, Defendant cancelled his chronic care medications and failed to treat a lump in his chest in violation of his Eighth and First Amendment rights are proceeding herein. Accordingly, given the substantial length of time Plaintiff has been incarcerated and his failure to provide facts linking the allegedly missing medical records for unspecified medical issues to his claims proceeding herein, Plaintiff's statements that he received medical treatment for medical issues prior to coming to MCCX, but the records for those issues are not in the medical records he received from Defendant, do not allow the Court to plausibly infer that the allegedly missing medical records are relevant to his claims proceeding herein. Nor do Plaintiff's allegations that a nurse who is not a party to this action failed to treat his spinal column, labrum, and a tendon eighteen months after he filed his complaint allow the Court to plausibly infer that he is entitled to further discovery from Defendant. This is especially true because Defendant has filed extensive proof of the medical care provided and offered to Plaintiff during the time period relevant to the complaint (Doc. 74), and nothing in the record suggests that providing Plaintiff more discovery would change the ultimate result in this case.

In short, it is apparent that Plaintiff's claim that Defendant failed to provide him with discovery regarding her professional history in his pending motion for discovery (Doc. 61, at 1–

2) is now moot. Likewise, the record establishes that Plaintiff has failed to file the required certification and declaration or affidavit regarding his requests for additional discovery. Also, after balancing all the relevant factors as set forth above, the Court finds that Plaintiff is not entitled to additional discovery under the relevant Rules of Civil Procedure. Accordingly, Plaintiff's filings seeking additional discovery (Docs. 61, 67, 70, 72) are **DENIED**.

## II.    MOTIONS TO FILE JOINT APPENDIX UNDER SEAL

Defendant filed two motions to file certain documents under seal (Docs. 73, 84). Plaintiff filed a response purporting to oppose the second motion (Doc. 91), but this filing contains no substantive opposition and instead mistakes the second motion to seal with a motion to extend that the Court previously denied (*Id.* at 1; Doc. 79). Accordingly, for good cause shown therein and due to the lack of any substantive opposition, these motions (Docs. 73, 84) are **GRANTED** to the extent that the relevant filings (Docs. 74, 85) **SHALL** remain under seal.

## III.   SUMMARY JUDGMENT

Defendant filed a motion for summary judgment (Doc. 75), in support of which she filed a memorandum (Doc. 76) and a portion of Plaintiff's medical records from the time period relevant to the complaint (Doc. 74). Plaintiff filed a response in opposition to Defendant's motion (Doc. 81), in support of which he filed a declaration (Doc. 82) and a statement of disputed facts (Doc. 83). Defendant filed a reply (Doc. 86), a response to Plaintiff's statement of undisputed facts (Doc. 87), and additional medical records (Doc. 85). Plaintiff then filed another sworn declaration (Doc. 89) in support of a subsequent motion for injunctive relief (Doc. 88).

For the reasons set forth below, the undisputed proof in the record demonstrates that a jury could not reasonably find that Defendant violated Plaintiff's constitutional rights.

9

Accordingly, Defendant's motion for summary judgment (Doc. 75) will be **GRANTED**, and this action will be **DISMISSED**.

### A.     Standard

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ., at 56(a).  In ruling on a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  To successfully oppose a motion for summary judgment, "the non-moving party . . . must present sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010).

### B.     Background

As set forth above, this action proceeded only as to Plaintiff's claims that, between February 2023 and May 2023, (1) Defendant cancelled his chronic care medications and failed to examine a lump in his chest in violation of the Eighth Amendment; and (2) the cancellation of his chronic care medications was retaliation for him filing a sick call request regarding those medications in violation of the First Amendment (Doc. 2, at 6–7; Doc. 63, at 2).  As Plaintiff's complaint in which he sets forth these claims is not sworn, the Court does not consider it evidence for summary judgment purposes.  *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (providing a sworn complaint "carries the same weight" as an affidavit for purposes of summary judgment); *Dole v. Elliot Travel & Tours, Inc.*, 942 F.2d 962, 968–69 (6th Cir. 1991) (providing that a court may not consider unsworn statements in evaluating a motion for summary

10

judgment). However, after Defendant filed her motion for summary judgment, Plaintiff filed two sworn declarations regarding his claims (Docs. 82, 89), which the Court will consider in determining whether Defendant is entitled to summary judgment.

In his first declaration, Plaintiff asserts that while Defendant claims in her affidavit that he did not receive certain treatment because he threatened her, she did not present any proof of any disciplinary action against him or statements from other present staff members regarding this incident (Doc. 82, at 1). Plaintiff then claims that when he came to MCCX, his "prescribed meds that he was allowed to keep were taken out of his property" (*Id.* at 2). The next day, he asked two nurses about those medications (*Id.*). According to Plaintiff, the first nurse got angry and told him not to tell her how to do her job, and the second one told him that Defendant had cancelled the medications (*Id.*).

Plaintiff further states that he filled out numerous sick calls and tried to obtain treatment, but "each nurse made it clear that [Defendant] was not treating [Plaintiff] until she felt need to do so" (*Id.*). Plaintiff also wrote Bowman Wright, Defendant's supervisor, and told Mr. Wright that he was being denied medical care and being told he was refusing medical care even though Defendant had canceled the medical care (*Id.*). Plaintiff then claims that (1) he did not refuse medical care; (2) he has "serious injuries and [a] painful condition"; and (3) "no professional would terminate care for a person with [a] tendon and muscle tear and spinal injuries [for which] specialists recommended surgery" (*Id.* at 3).

Plaintiff attached two documents to this declaration (*Id.* at 5–11). First, Plaintiff attached an unsworn letter from Mr. Wright that mainly outlines Plaintiff's refusals of medications and treatment at MCCX (*Id.* at 5). Next, Plaintiff attached medical records from 2017, 2018, and

2019 regarding a tendon injury, a labrum tear, and cervical issues for which doctors recommended a spine surgery consult and steroid injections in 2019 (*Id.* at 6–11).

In his second declaration, Plaintiff claims that on the day after he complained to a nurse about the taking of his property when he arrived at MCCX, Defendant cancelled his medications without ever interacting with him (Doc. 89, at 1–2). Plaintiff then asserts that, contrary to Defendant's affidavit, she has never treated Plaintiff, as she would have to physically see and examine him to prescribe him treatment or medication (*Id.* at 2). Plaintiff also states that he has not received treatment for his "serious medical conditions" and has not refused to meet with specialists (*Id.*). Plaintiff further avers that his specialist appointment was delayed due to COVID and Defendant has no knowledge of this because he was housed in a different facility (*Id.*). Plaintiff then states that "on information and belief," he has not received "a course of medical treatment and physical therapy despite [his] repeated requests" (*Id.*). He also claims that he has not received "a consultation with a physician qualified to assess and treat [his] condition" (*Id.*). Plaintiff further asserts that MCCX has a policy of giving low priority to the medical needs of "inmates who question their authority and or flat out refusing medical care unless a complaint is filed and forced to do so" (*Id.*).

Plaintiff then states that "the medical care and therapy services are not provided at MCCX" and "prisoners needing such services are sent to special needs prison in Nashville" (*Id.*). Plaintiff additionally claims that he has a labrum tear, tendon injury, nerve damage, and spinal injury that cause him constant pain and put him at risk of his arm not healing properly and him being unable to properly walk (*Id.*). Plaintiff next asserts that, as a MCCX nurse practitioner, Defendant is responsible for scheduling appointments for inmates who need specialized medical

treatment or evaluation and treating and/or prescribing medication for inmates who have medical needs (*Id.*).

In support of her motion for summary judgment, Defendant filed, among other things, (1) her own affidavit regarding her actions with regard to Plaintiff (Doc. 74, at 162–77), and (2) Plaintiff's medical records from the relevant time period (Doc. 74).

The Court summarizes Plaintiff's relevant medical records as follows:

February 8    MCCX Nurse Linder reviewed Plaintiff's "Transfer/Discharge Health Summary" from West Tennessee State Penitentiary ("WTSP") which noted that Plaintiff's "current physician/dentist medication order[s]" included Acyclovir, Amlodipine, Vistaril, Terbinafine, Buspar, Tylenol, Absorbase, and Gelusil.  According to this document, all these medications except the Absorbase and Gelusil were sent with Plaintiff to MCCX [*Id.* at 5).  Also, all these medications except the Acyclovir and Vistaril were marked "KOP," which stands for "keep on person" (*Id.* at 5, 174).  In the "brief summary of current health problems" portion of this form, a prison official wrote "[m]ajor [d]epressive DO w/ [a]nxious [d]istress" (*Id.* at 5).

February 9    A medical provider noted that Plaintiff did not have an upcoming consult (*Id.* at 4).

Plaintiff submitted two sick calls forms (*Id.* at 7–8).

In the first sick call form, Plaintiff requested to see an eye doctor and a provider about medications (including soap and Absorbase for dermatitis), and to see mental health (*Id.* at 7).  Notes on this form indicate that a nurse triaged Plaintiff's mental health request and determined he was not suicidal (*Id.*).

In the second sick call form, Plaintiff again requested to see an eye doctor, and a nurse noted he was placed on the eye doctor list (*Id.* at 8).

February 10   A mental health nurse visited Plaintiff, who refused to have his vital signs taken [*Id.* at 11].  The nurse noted Plaintiff would not have a follow up with mental health at MCCX due to recently seeing mental health at WTSP (*Id.*).

Plaintiff's Absorbase cream was noted to be unavailable (*Id.* at 13).

February 12   Plaintiff submitted a sick call request for KOP Absorbase and soap, as well as mental health treatment (*Id.* at 14).

February 13   A nurse marked Plaintiff's February 12 sick call request "done" (*Id.*).

13

Plaintiff submitted another sick call request for his "overdue" Absorbase and soap (*Id.* at 15).

Plaintiff was triaged for his request for mental health treatment but refused to discuss the reasons he needed mental health treatment with the nurse and refused to have his vital signs taken (*Id.* at 16).

February 14  Plaintiff refused a sick call visit regarding his February 13 sick call request (*Id.* at 15).

February 15  Plaintiff submitted another sick call request for soap (*Id.* at 19).

February 16  Plaintiff refused a sick call visit for his February 15 sick call request (*Id.* at 19, 22).

Nurse Allen explained in a note that they did not receive the soap KOP from Plaintiff's prior prison and therefore had to reorder it, but the pharmacy informed them that the soap is non-formulary and needed verification. She also noted that Plaintiff verbalized his understanding and asked about his Tums KOP, but there was no documentation or order for it. Plaintiff refused to sign the refusal form (*Id.* at 20).

Plaintiff submitted a sick call request for KOP Tylenol (*Id.* at 18).

February 17  Plaintiff refused a sick call visit for Tylenol (*Id.* at 18, 21).

February 18  Plaintiff submitted a sick call request for Tums and throat lozenges for a sore throat (*Id.* at 23).

Nurse Kennedy documented that Plaintiff does not have a diagnosis or order for Tums, noted his chronic care visit was scheduled for May 2023, and requested Gelusil for Plaintiff (*Id.* at 24).

February 19  Plaintiff requested to see a provider about jaw, neck, and shoulder pain, and to inquire about the status of his soap and antacid tablets (*Id.* at 25).

February 20  Nurse Ellis evaluated Phillips for jaw and face pain. No swelling or distress was noted. Nurse Ellis notified Defendant and dental. Dr. Nguyen prescribed Plaintiff Ibuprofen for 4 days for his jaw/dental pain (*Id.* at 25–26).

February 21  Plaintiff submitted a sick call request for soap (*Id.* at 31).

February 22  Plaintiff was placed on the eye doctor log (*Id.* at 8).

Plaintiff refused a sick call visit for soap (*Id.* at 31). Nurse Allen documented that the soap was previously ordered but not yet received, and that Plaintiff received Dove soap the previous Thursday (*Id.* at 32). Nurse Allen told Plaintiff that the soap was ordered and should arrive within a couple of days, and Plaintiff verbalized understanding (*Id.* at 33).

14

February 26    Plaintiff submitted a sick call request for Tums, inquired about his soap, and requested to see a provider for chest pain (*Id.* at 34).

February 27    Plaintiff refused a sick call visit for the request submitted on February 26 (*Id.* at 33–34).

February 28    Plaintiff submitted another sick call request for Tums and soap, in which he also requested to see a provider about chest pains and difficulty swallowing food (*Id.* at 41).

                 LPN Springs assessed Plaintiff for left-sided chest pain and swelling under the armpit. She found no cardiac pain but noted pain in the muscle under the armpit with minimal swelling for which ice provided relief. She instructed Plaintiff to resubmit a sick call request if the problem worsened or did not improve, and to use ice as needed (*Id.* at 36–37).

March 1      Plaintiff submitted a sick call request for his KOP soap and to see a provider about his accelerated heart rate, chest pain, and shoulder pain (*Id.* at 40).

March 2      Plaintiff submitted a sick call request for blood pressure medication, stating his blood pressure was 142/103 the prior Thursday. He also requested his KOP soap and stated his was taken from him (*Id*. at 41).

                 Plaintiff refused a sick call visit for his requests regarding blood pressure medication and soap (*Id.* at 42, 43, 45).

March 4      Plaintiff submitted a sick call request stating he did not receive two bars of soap on February 17, 2023, despite a record stating he did (*Id.* at 44).

March 5      Plaintiff refused a sick call visit regarding the soap discrepancy. Plaintiff was instructed to fill out an information request form about his Ivory soap (*Id.* at 44, 45, 46).

March 6      Plaintiff submitted a sick call request regarding an accelerated heart rate and dizziness and was referred to mental health (*Id.* at 47).

March 7      Nurse Ellis triaged Plaintiff, who brought up vision problems related to an incident at another facility and requested to see both a physician and an eye doctor. Plaintiff was told to complete one sick call at a time (*Id.* at 48).

March 11    Plaintiff submitted a sick call request for migraines (*Id.* at 51).

March 12    Plaintiff submitted a sick call request for migraines and shoulder pain. LPN Hamby triaged Plaintiff, who reported having daily migraines for about a month, exacerbated by being punched in the back of the head in January at another facility. LPN Hamby referred Plaintiff to Defendant (*Id.* at 52–54).

| March 14 | Defendant evaluated Plaintiff for migraines. Plaintiff reported having migraines located behind his eyes for two months and described the pain as stabbing. Defendant noted Plaintiff had a history of cervical radiculitis, diagnosed him with cluster headaches, and advised him to increase fluid intake and alternate Tylenol and Ibuprofen. Defendant planned to start him on a trial of propranolol with blood pressure and heart rate monitoring. No head injuries were noted. Plaintiff understood and agreed with the plan. Defendant ordered Inderal for headaches and blood pressure/heart rate checks three times per week for two weeks, then once weekly for six weeks, and she planned to follow up in one and a half months (*Id.* at 55–56). |
|---|---|
| March 15 | Plaintiff stopped taking Inderal (*Id.* at 65). |
| March 16 | Bowman Wright responded to Plaintiff's complaints about his medical care at MCCX. Wright summarized Plaintiff's medical history since arriving at MCCX on February 8, 2023, including Plaintiff's refusals of treatment and medications, refusals of x-ray, dental and optometry appointments, and the expiration of his ice pack AVO, and he encouraged Plaintiff to cooperate with medical services (*Id.* at 150).<br><br>Plaintiff submitted a sick call request for KOP soap and Tylenol (*Id.* at 61). |
| March 17 | Plaintiff refused a sick call visit for his March 16 sick call request (*Id.* at 61, 62, 64).<br><br>Plaintiff submitted a sick call request for KOP soap and Tylenol, reporting swelling in his face and eyes, seeing spots, and having headaches (*Id.* at 60). |
| March 18 | Plaintiff refused sick call for his March 17 sick call request (*Id.* at 60, 62, 63). |
| March 19 | LPN Springs triaged Plaintiff, who stated he stopped taking Inderal on March 18, 2023, due to the side effect of eye swelling and lack of improvement regarding his headaches. No swelling was noted. Plaintiff reported eye and forehead swelling (*Id.* at 65–66, 68). |
| March 20 | Defendant noted that Plaintiff stopped taking Inderal and stated that he did not give the medication enough time to take effect, that she planned to address the issue at the next chronic care visit, and that Plaintiff refused treatment (*Id.* at 68). |
| March 21 | Plaintiff submitted a sick call request for KOP soap stating in relevant part that the soap was due on March 17, 2023, but he had not received it (*Id.* at 58). |
| March 24 | Plaintiff refused a blood pressure check (*Id.* at 77). |
| March 27 | Plaintiff submitted a sick call requesting to see a provider and his KOPs, including specifically "Tums (Gelusil)" (*Id.* at 70).<br><br>Plaintiff submitted another sick call regarding Tums in which he also requested nail clippers (*Id.* at 71). |

| | |
|---|---|
| March 28 | Plaintiff refused a sick call, presumably for his March 27 requests (*Id.* at 67, 74). |
| | Plaintiff refused a blood pressure check (*Id.*). |
| | Plaintiff refused an eye exam (*Id.* at 72). |
| March 29 | Plaintiff submitted a sick call request for his KOP Tums (Gelusil), soap, and nail clippers, and also asked to see a provider about his migraines.  Plaintiff also stated that he had sent an information request to the pharmacy about his KOP soap (*Id.* at 69). |
| March 30 | Defendant ordered Plaintiff's Gelusil to expire, pending a diagnosis or evaluation at his upcoming chronic care visit (*Id.* at 78). |
| April 1 | Plaintiff filed a sick call request regarding KOP soap, Tylenol, and Gelusil (*Id.* at 81) |
| April 2 | Plaintiff refused sick call for his KOPs request (*Id.*). |
| | Plaintiff filed another sick call request for KOP soap and Gelusil (*Id.* at 80). |
| April 3 | Plaintiff refused sick call for his KOPs request (*Id.* at 80, 83). |
| | Plaintiff refused a blood pressure check (*Id.* at 82). |
| April 4 | Nurse Laxton saw Plaintiff for an acid reflux complaint. Plaintiff refused his vitals and weight (*Id.* at 89, 90). |
| | Dr. Nguyen prescribed Plaintiff simethicone for flatulence (*Id.* at 84). |
| April 9 | Plaintiff filed a sick call request regarding migraines and shoulder pain (*Id.* at 92). |
| April 10 | Plaintiff refused sick call for his April 9 request (*Id.* at 92, 93, 97). |
| | Plaintiff refused his weekly blood pressure reading and heart rate screening (*Id.* at 95, 96). |
| April 11 | Defendant ordered Plaintiff's KOP soap to expire, with plans to reevaluate at his next chronic care visit (*Id.* at 78). |
| | Plaintiff filed a sick call request regarding shoulder pain, inflammation, difficulty swallowing, migraines, blurry vision, face and forehead swelling, and acid reflux, in which he also requested KOP Tylenol (*Id.* at 98). |
| April 12 | Plaintiff was seen for his April 11 sick call request (*Id.*) and prescribed Tums for dyspepsia and Acetaminophen as needed for pain (*Id.* at 78). |

Plaintiff was reported for "medical noncompliance" regarding his Acyclovir and Atarax (*Id.* at 103).

April 13    Plaintiff submitted a sick call request for shoulder pain and migraines (*Id.* at 99).

April 14    Plaintiff refused sick call for his April 13 request (*Id.* at 99, 100).

April 15    Plaintiff filed a sick call request regarding shoulder pain, migraines, blurry vision, acid reflux, and a lump in his right chest (*Id.* at 101).

April 16    Plaintiff refused sick call for his April 15 request and became aggressive (*Id.* at 103, 104).

April 18    RN Allen saw Plaintiff for difficulty swallowing and a knot on his clavicle. He refused vitals, weight, and assessment. He also showed the nurse his clavicle and told her it felt like there was a knot on it and he was having difficulty swallowing, was getting choked, and had to sleep a certain way or he woke up choking. She referred him to the doctor for GERD and cervical radiculopathy (*Id.* at 106–108).

April 19    Plaintiff submitted a sick call request asking why his skin cream, soap, and antacids were discontinued when his chronic care visit was not until May (*Id.* at 109).

April 20    Plaintiff refused a sick call visit for his April 19 request (*Id.* at 109–11).

April 21    Plaintiff submitted a sick call request for a lump in his chest causing swallowing and breathing difficulties (*Id.* at 102).

Plaintiff was prescribed Acyclovir (*Id.* at 112).

April 22    Plaintiff filed a sick call request regarding nail clippers and chronic care medications and seeking care for his acid reflux, migraines, and skin (*Id.* at 113).

April 23    Plaintiff refused sick call for his April 22 sick call request and was placed on the clipper list (*Id.* at 94).

April 24    Plaintiff refused his weekly blood pressure check (*Id.*).

May 1    Plaintiff submitted a sick call request regarding the lump in his chest getting bigger (*Id.* at 114).

Plaintiff refused his vitals and a blood pressure check (*Id.* at 116).

Plaintiff was reported for noncompliance with his Acyclovir and Absorbase cream (*Id.* at 115).

18

| May 2 | Plaintiff refused sick call for his May 1 request, was notified that he was scheduled to see a provider on May 8, and stated his sick call could wait until May 8 (*Id.* at 114, 118). |
| | |
| | Plaintiff submitted a sick call request for nail clippers and a lump in his chest (*Id.* at 117). |
| | |
| May 3 | Plaintiff refused sick call. Nurse Hatfield informed him that he was scheduled to see a provider May 8. Plaintiff showed no signs of discomfort or distress and refused to sign the refusal form (*Id.* at 118, 119). |
| | |
| | A nurse entered a medical note that the Court cannot interpret (*Id.* at 120). |
| | |
| May 4 | Plaintiff was rescheduled for nail clippers due to none being available (*Id.* at 118). |
| | |
| May 5 | Defendant discontinued Plaintiff's Propranolol due to non-compliance and ordered Norvasc days for Plaintiff's hypertension (*Id.* at 120). |
| | |
| May 8 | Plaintiff submitted a sick call request complaining that the lump in his chest was spreading and causing shortness of breath and difficulty swallowing, for which he refused sick call (*Id.* at 124). |
| | |
| | Plaintiff refused blood pressure check (*Id.* at 121, 122). |
| | |
| | Plaintiff was reported for non-compliance with Acyclovir and Vistaril (*Id.* at 123). |
| | |
| May 9 | Plaintiff had a chronic care visit. At this visit, Defendant discussed treatment of Plaintiff's GERD and offered simethicone. She also discussed his left shoulder pain, noting negative x-rays and a 2017 MRI showing tendonitis and a small labrum tear, which were treated conservatively and could heal without further intervention. However, Plaintiff was then verbally aggressive, refused further assessment and treatment, and refused to sign the refusal form, stating "f[*]ck this - take me to my f[*]ucking house." Defendant scheduled another chronic care visit in 3 months. [*Id.* at 120, 125–29]. |
| | |
| February– May 2023 | Multiple medical administration record documents in Plaintiff's medical records demonstrate the administration of a number of medications, including Vistaril, Ibuprofen, Absorbase, Tylenol, Acyclovir, Amlodipine, Gelusil, Ivory soap, Hydroxyzine, Terbinafine, Inderal, Atarax, Simethicone, Acetaminophen, Propranolol, and Norvasc, to Plaintiff at least periodically, and sometimes consistently, during the time period relevant to his complaint (*Id.* at 27–30, 38–39, 49–50, 85–87, 131–32). |

In her affidavit in support of her motion for summary judgment, Defendant states in

relevant part that she was one of the medical providers for Plaintiff from February 2023 to May

2023, the time period relevant to this action, and that TDOC prisoners receive medical care at

chronic care visits and must file sick call requests for all other medical needs (Doc. 74, at 163).

19

Defendant then summarizes the medical care Plaintiff requested and medical providers provided and/or attempted to provide him during the time period relevant to the complaint by citing his medical records, which the Court summarized above (*Id.* at 163–174).

Defendant further states that she did not cancel Plaintiff's chronic care medications due to Plaintiff filing sick call requests, grievances, or lawsuits (*Id.* at 175). To the contrary, Defendant asserts that a number of Plaintiff's medications had a stop date in April 2023, in support of which she cites a medical record providing that Plaintiff's Absorbase, Acetaminophen, Acyclovir, Amlodipine, Gelusil, and Ivory soap all had a "stop by" date in April 2023 and a medical record noting Plaintiff's non-compliance with his Absorbase (*Id.* at 83, 175). Defendant also testifies that, in her medical judgment, she did not see a need to continue these medications, especially given Plaintiff's repeated refusals of medical treatment and his chronic care visit scheduled in May 2023 (*Id.* at 175).

Defendant further notes that while Plaintiff was on Terbinafine upon his entry into MCCX, that medication had a documented stop date of March 8, 2023, and she did not see any indication to continue that medication based on her medical judgment, in support of which she cites medical records that are consistent with these statements (*Id.* at 27, 49, 175). She also states that, as set forth above, she stopped Plaintiff's Inderal after he was non-compliant with that medication and she determined he no longer needed it, and that she was not responsible for determining whether Plaintiff should continue his mental health medications (*Id.* at 175).

Defendant further testifies that she did not cancel Plaintiff's chronic care visit at any point during the time period relevant to his claims proceeding herein, and that Plaintiff received his six-month chronic care visit in a timely manner on May 9, 2023, after receiving his last chronic care visit at WTSP on November 21, 2022 (*Id.* at 174–75). Defendant also notes that,

20

consistent with the medical records the Court summarized above, after she took Plaintiff's vitals at his May 2023 chronic care visit, Plaintiff became aggressive and refused further medical care (*Id.* at 172–73). Defendant still attempted to evaluate Plaintiff, but he refused a physical exam (*Id.* at 173). Nevertheless, Defendant documented Plaintiff's hypertension, discussed treatment of his GERD, and offered him Simethicone since the Tums had been ineffective (*Id.* at 173). Defendant also discussed Plaintiff's shoulder pain, including the "lump," and explained that all x-rays were negative and that she therefore did not recommend any further imaging (*Id.*). She additionally told Plaintiff that the results of his 2017 MRI showed tendonitis and a small labrum tear, which were treated with "ice, rest, heart [sic], NSAIDS" and could heal without further intervention (*Id.*).

Defendant also states that Plaintiff had previously refused orthopedic consults and follow ups to address his shoulder issues, which she also noted in his medical records regarding this visit (*Id.* at 173, 128), and in support of which she filed medical records with her reply (Doc. 85, at 8 (Plaintiff's signed refusal of an MRI on December 10, 2019);, at 10 (Plaintiff's signed refusal of "Ortho" on 9/30/2021);, at 14 (Plaintiff's documented refusal of sick call after an x-ray on July 4, 2023)). Defendant additionally states that she planned to discuss a treatment plan for Plaintiff's shoulder issue that included offering joint injection and an orthopedic consult but could not do so because Plaintiff became aggressive, threatened to sue her, threatened her physically, and refused any further medical treatment, including a physical assessment (Doc. 74, at 173). As such, Defendant was unable to assess Plaintiff's medical complaints, including his lump, as she cannot force prisoners to receive a medical evaluation (*Id.* at 174). And after this refusal of medical care from Plaintiff on May 9, 2023, Defendant was no longer responsible for

Plaintiff's medical care, as that responsibility was passed to other providers due to the breakdown in Plaintiff and Defendant's patient/provider relationship (*Id.*).

Defendant additionally states, among other things, that (1) at all times relevant to this action, she provided appropriate and responsive care to Plaintiff; (2) she never directed anyone not to provide Plaintiff care or treatment; (3) Plaintiff received all clinically indicated treatment for his medical conditions; (4) Plaintiff did not receive further medical interventions or care for his medical conditions, including his lump and chronic care conditions, because she determined in her medical judgment that he did not need any such further care or interventions; (5) she was never deliberately indifferent to Plaintiff's needs for medical care; (6) she never retaliated against Plaintiff; (7) she followed the appropriate standard of care in caring for Plaintiff; and (8) she never caused Plaintiff any injury [*Id.* at 176].

### C.    Analysis

As the undisputed evidence in the record establishes that Defendant was not deliberately indifferent to Plaintiff's serious medical needs and did not deny Plaintiff medical care due to his protected conduct, her motion for summary judgment (Doc. 75) will be **GRANTED**, and this action will be dismissed.  The Court will address these claims in turn.

### 1.    Deliberate Indifference to Serious Medical Needs

The undisputed evidence in the record demonstrates that no jury could reasonably find that Defendant was deliberately indifferent to Plaintiff's serious medical needs as alleged in his complaint.  As such, Defendant is entitled to summary judgment on these claims.

A prison official's deliberate indifference to a prisoner's serious medicals needs violates the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Jail medical providers may be deliberately indifferent to serious medical needs "in their response to a prisoner's needs" or

by "interfer[ing] with treatment once prescribed." *Id.* at 104–05. Establishing a violation of the Eighth Amendment in the medical context requires evidence that the acts or omissions of an individual operating under the color of state law were "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Such a claim "has [both] objective and subjective components." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004).

Under the objective prong, the court must determine whether the plaintiff had a sufficiently serious medical need. *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). A plaintiff may establish a serious medical need in two ways: (1) by showing that the injury was so obvious that even a lay person would easily recognize the need for medical treatment; or (2) if the injury was less obvious or the prisoner challenges a denial of a certain medical treatment, by showing the detrimental effect of a delay in treatment. *Blosser v. Gilbert*, 422 F. App'x 453, 460 (6th Cir. 2011) (citing *Blackmore*, 390 F.3d at 897).

The Sixth Circuit has specified that "[a] prisoner's allegation that a prison has failed to treat his condition adequately falls into the second category of cases, and . . . is evaluated under the effect-of-delay standard." *Anthony v. Swanson*, 701 F. App'x 460, 463 (6th Cir. 2017). Accordingly, a plaintiff asserting a claim for denial of a certain treatment must set forth medical testimony that the failure to provide him that treatment was detrimental to him to successfully counter a motion for summary judgment. *Id.* (finding that where the plaintiff challenged defendants' decision to deny him a colostomy, he had to "present a medical expert who can speak to the necessity of such a treatment and evaluate it vis-à-vis the treatment he received" and that, without such "medical testimony, his claim cannot succeed as a matter of law").

The subjective component requires proof that the prison official acted with deliberate indifference. *Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005), *abrogated on other grounds in Pearson v. Callahan*, 555 U.S. 223 (2009). Deliberate indifference is more than mere negligence—it requires a mental state amounting to criminal recklessness. *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839–40). To meet this subjective standard, the defendant must have: (1) "perceived the facts from which to infer substantial risk to the prisoner," (2) "draw[n] the inference;" and (3) "then disregarded that risk." *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

The fact that a prisoner did not receive the medical treatment he wanted or received a misdiagnosis is insufficient to establish a claim for violation of the Eighth Amendment. *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017) (holding that "[a] patient's disagreement with his physicians over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983"). Thus, where a prisoner received medical care, his disagreement with the adequacy of that care generally does not rise to the level of a constitutional violation. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1996) (noting that "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law"). But medical care that is "so woefully inadequate as to amount to no treatment at all" violates the Eighth Amendment. *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2001).

### a. Chronic Care Medications and Visit

First, as to Plaintiff's claims regarding Defendant's denial of his chronic care medications and termination of his chronic care visit without examining his lump, Plaintiff has failed to allege or come forward with any medical evidence that these incidents caused any detriment to him,

such that a reasonable jury could find that he had a serious medical need underlying these claims. Additionally, the record contains no evidence from which a jury could reasonably find these incidents occurred due to Defendant's deliberate indifference. As such, Defendant is entitled to summary judgment on these claims.

The Court notes that the parties have different versions of the events underlying Defendant's cancellation of his chronic care medications and the circumstances of his May chronic care visit, including her failure to examine Plaintiff's "lump." Specifically, Plaintiff asserts in his declarations that Defendant cancelled his chronic care medications in the first days after he arrived at MCCX in February 2023, that he has never refused medical care, and that Defendant has never treated him because she has never seen and examined him (Docs. 82, 89). Defendant, on the other hand, testifies that she allowed certain of Plaintiff's chronic care medications to expire in April 2023, as they were scheduled to do, based on her medical judgment, Plaintiff's refusals of sick call visits, and the fact that his chronic care visit was scheduled in May (Doc. 74, at 175).

Notably, Plaintiff does not specify in his complaint or declarations what medications he should have received but did not during the time period relevant to the complaint. And Defendant testifies that Plaintiff received a number of medications during the time period relevant to his complaint despite his repeated refusals of sick call visits after he filed sick call requests (*Id.* at 162–174), which the medical records summarized above corroborate.

However, regardless of what medication(s) Plaintiff asserts he should have received but did not, the parties' factual disputes regarding Plaintiff's medical care claims do not create a genuine issue of material fact that precludes granting Defendant's motion for summary judgment, as the only medical evidence regarding these claims in the record is Defendant's

testimony that provides in relevant part that, at all times relevant to this action, Plaintiff received all clinically indicated treatment for his medical conditions and did not suffer any injuries due to her acts or omissions (*Id.* at 176). And the record does not contain (1) any evidence that Plaintiff's medical issues were so obvious that a layperson would have recognized his need for additional medications or more medical care at his chronic care visit, or (2) any medical evidence that Plaintiff's failure to receive any medications or more medical care at his chronic care visit caused any detriment to him. Accordingly, no reasonable jury could find Plaintiff had a serious medical need, as required for him to establish the objective factor underlying his Eighth Amendment claims challenging Defendant's denial of his chronic care medications and failure to provide additional treatment for his lump at his chronic care visit. *Blosser*, 422 F. App'x at 460; *Swanson*, 701 F. App'x at 463.

Moreover, while Plaintiff generally alleges in his first declaration that Defendant "has never treated" him because she would have to see and examine him to do so (Doc. 89, at 2), Plaintiff does not explain or provide facts to support this conclusory assertion, which the Court notes seems to be very carefully worded to include a requirement that Defendant both see and examine him, especially in light of Plaintiff's allegations in his complaint that this Defendant saw him for a medical visit on May 9 (Doc. 2, at 7). But even if the Court accepts this conclusory and oddly specific assertion as true, Plaintiff has not come forward with any admissible evidence to dispute Defendant's sworn assertions that he did not receive further care for his medical conditions, including his lump and chronic care issues, due to Defendant's medical judgment that he did not need such additional care (Doc. 74, at 176). And Defendant's use of her medical judgment to determine that she would allow some of Plaintiff's medications to expire and to not provide him additional medical care was not a violation of Plaintiff's

26

constitutional rights. *Robbins v. Black*, 351 F. App'x 58, 60–62 (6th Cir. 2009) (affirming a district court's grant of summary judgment to a defendant where the plaintiff alleged claims arising out of his fall while climbing into a top bunk, but the proof showed defendant relied on his medical judgment to determine that the plaintiff did not need a top bunk after a nurse previously determined that he needed a bottom bunk); *Lloyd v. Moats*, 721 F. App'x 490, 495 (7th Cir. 2017) (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 797 (7th Cir. 2014); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (finding that "inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise independent medical judgment" (citation omitted)).

Defendant also testifies that Plaintiff's chronic care visit ended before she could suggest further care for Plaintiff's lump due to Plaintiff's refusal of a physical examination and his aggression (*Id.* at 173–75(, which is consistent with the medical records summarized above (*Id.* at 120, 125–29). And while Plaintiff's first sworn declaration implies that Defendant should have come forward with more evidence of his aggression at his chronic care visit to support her motion for summary judgment and makes the conclusory assertion that he never refused medical care (Doc. 82, at 1–3), Plaintiff has never set forth any admissible proof that he was unaggressive at his chronic care visit but Defendant still refused to provide medical care for his lump or other medical conditions. Nor has Plaintiff come forward with any other admissible proof that would allow a reasonable jury to find that Defendant's deliberate indifference, rather than Plaintiff's aggressive behavior, prevented Defendant from providing him additional care for his lump at that visit.

In short, given (1) the undisputed proof of the substantial medical care provided to Plaintiff during the time period relevant to the complaint; (2) Defendant's undisputed sworn

medical testimony that she used her medical judgment to determine that Plaintiff did not need the medications she allowed to expire and did not need further medical intervention regarding his lump, shoulder, or other chronic conditions and received all clinically indicated care during the time period relevant to the complaint; and (3) the fact that Plaintiff has set forth no admissible proof disputing Defendant's sworn proof that his chronic care visit was terminated due to his aggressive behavior, which both Defendant's sworn testimony and the medical records support, no jury could reasonably find that Defendant violated Plaintiff's Eighth Amendment rights through deliberate indifference to his serious medical needs.

Moreover, while Plaintiff's second sworn declaration makes a number of general allegations regarding his inability to receive certain care or treatment at MCCX, including physical therapy and specialist treatment, and also asserts that Defendant is responsible for scheduling specialized medical visits and prescribing and treating all inmates for their serious medical needs (Doc. 89, at 2–4), these conclusory and general allegations would not allow a jury to reasonably that Defendant personally violated Plaintiff's Eighth Amendment rights with regard to his claims proceeding herein, and the Court will therefore not further address them on the merits. *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (providing that "a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights" to state a claim upon which relief may be granted under § 1983); *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[O]ur precedents establish . . . that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*").

### 2. Retaliation

The last claim remaining herein arises out of Plaintiff's allegation that Defendant cancelled his chronic care medications and/or chronic care visit due to him filing sick call requests. To establish a retaliation claim, Plaintiff must show that: (1) he "engaged in protected conduct; (2) an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

As set forth above, in support of her motion for summary judgment, Defendant has set forth sworn proof that she did not fail to provide Plaintiff any medication or care due to his protected conduct (Doc. 74, at, at 175). And Plaintiff has not offered any admissible proof from which a jury could reasonably find that Defendant did so.

The Supreme Court has found that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Accordingly, Defendant is entitled to summary judgment on all of Plaintiff's claims, and her motion for summary judgment (Doc. 75) will be **GRANTED**.

## IV. CONCLUSION

For the reasons set forth above:

1. Plaintiff's requests for additional discovery (Docs. 61, 67, 70, 72) are **DENIED**;

2. Defendant's motions to file certain documents under seal (Docs. 73, 84) are **GRANTED** to the extent that the relevant filings (Docs. 74, 85) **SHALL** remain under seal;

3. Defendant's motion for summary judgment (Doc. 75) will be **GRANTED** and this action will be **DISMISSED**;

4. Plaintiff's motion for injunctive relief (Doc. 88), motion for an extension of time to file his pretrial narrative statement (Doc. 98), and motion to continue trial (Doc. 103) are **DENIED AS MOOT**; and

5. The Court **CERTIFIES** that any appeal from this decision would not be taken in good faith.  As such, this Court will **DENY** Plaintiff leave to proceed *in forma pauperis* on any subsequent appeal.

**SO ORDERED.  AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**